**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CHAMPION LABORATORIES, INC., | : | |
|  | : | |
| Plaintiff, | : | **OPINION** |
|  | : | |
| v. | : | Civ. No. 02-5284 (WHW) |
|  | : | |
| METEX CORPORATION et al., | : | |
|  | : | |
| Defendants. | : | |
|  | : | |

**Walls, Senior District Judge**

This case arises out of a dispute over groundwater contamination between two industrial neighbors.  By complaint, plaintiff sues defendant for land pollution under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 - 9675, and various state tort laws seeking monetary and other relief.  By counterclaim, defendant sues plaintiff for costs related to land pollution and other relief.

A bench trial of this controversy was held intermittently from December 2008 to May 2009.  After its conclusion, the parties, plaintiff Champion and defendant and counter-claimant Metex, submitted to the Court proposed findings of fact and conclusions of law.  The Court has reviewed them against the backdrop of the Court's notes, recollection and trial transcripts.  Notwithstanding the micro-factual submissions of the parties, the Court believes and finds much of those submissions to be irrelevant, hyperbolic rhetoric, and not necessary to the Court's ultimate conclusions.

NOT FOR PUBLICATION

This Opinion will be based and concentrated on what the Court has found to be material and supportive facts necessary to answer the primary questions: Did Champion prove its claims against Metex by the preponderance of the believable evidence?  Did Metex prove counterclaims by preponderance of the believable evidence?

Unfortunately, the trial was plagued - unique to this Court's experience - by many witnesses whose memory was absent of events that occurred (or did not occur) in the 1980s and earlier.  The result was many answers such as "I don't remember," "I don't know," or "I don't believe or guess so."  Such lack of recall is, of course, understandable when related to events of a quarter or more of a century ago.  But it was not helpful to the fact-finder.

That said, the Court has evaluated the credibility of all witnesses testing not only what they said but how they said it and what was not said against these criteria: Was this more likely so or not?  Did what was said make sense in the totality of circumstances?  And the Court finds the following to be the facts.  To the extent any Finding of Fact reflects a legal conclusion, it shall be to that extent deemed a Conclusion of Law, and vice versa.

**FINDINGS OF FACT**

I.  **The Parties**

    *A.  Defendant Metex and Its Operations*

1.  Defendant Metex Corporation ("Metex") manufactures knitted wire mesh products for various industries, including the automotive industry.  (P248 at 3.)

2.  Metex leased the building at 206 Talmadge Road in Edison, New Jersey (the

**NOT FOR PUBLICATION**

"Metex Site") in 1973 and purchased it in 1980.  Metex continues to own it to the present.  (P248 at 3-4.)

3.      A division of Metex, Metex Automotive Products ("MAP"), operated at the Metex Site from 1973 through 1982.  MAP manufactured knitted wire supports for catalytic converters and exhaust seals for the automotive industry, primarily Ford and Chrysler, beginning in 1974.  (P248 at 4.)

4.      MAP used a degreaser, which contained trichloroethylene ("TCE") as the degreasing agent, in its manufacturing operations to clean wire mesh parts that had been lubricated with oils during fabrication.  (Tr. 12/9/08 at 116-17.)

5.      In 1974, a discharge of TCE occurred at the Metex Site.  (Tr. 12/9/08 at 135-36, 146-47.)

6.      In a 1984 report, Metex's then-environmental consultant, Princeton Aqua Science, suggested two other potential sources of the TCE contamination at the Metex Site: a spill out the southeast door of the building, and a leak near the solvent recovery still.  (P9 at 1-2.)

7.      The operations of MAP at the Metex Site ended in March or April of 1982.  (P248 at 4.)  No manufacturing operations, with the exception of Specialty Rubber, the operation of which are not at issue in this case, took place at the Metex Site between 1982 and 1992.  (P248.)

     *B.      Operations of Lee Filter (Predecessor to Plaintiff Champion)*

8.      Lee Filter Corp. ("Lee Filter") purchased the property at 191 Talmadge Road,

NOT FOR PUBLICATION

Edison, New Jersey (the "Interlee Site") from the Township of Edison in 1959, and that year

constructed the building that is now located there.  (Tr. 3/19/09 at 77-78; P230; D93.)  Lee Filter

sold the Interlee Site to Talmadge Realty Corporation the following year in 1960 but continued to

operate on the property.  (P231.)

       9.     The Interlee Site is located more than 400 feet downgradient from the Metex Site.

(Tr. 5/4/09 at 162; Tr. 12/15/08 at 13.)  The two sites are separated by a "wedge"-shaped

property known as One Ethel Road.  (Tr. 1/13/09 at 4; P. Dem. 1.)

      10.    Lee Filter began its operations at the Interlee Site in 1960 or 1961.  (Tr. 1/7/09 at

83.)  Lee Filter manufactured oil and air filters (primarily spin-on oil filters) for the automotive

industry.  (D7, C00820, ¶ 2; Tr. 1/7/09 at 54-55, 70.)

      11.    In 1982, Lee Filter was owned and operated by Interlee, Inc.  (P248 at 3.)

Plaintiff Champion Laboratories, Inc. ("Champion") acquired Interlee by merger in 1982 and

operated Lee Filter until November 22, 1985, at which time it ceased manufacturing operations at

the Interlee Site and transferred them out of state.  (P248 at 3.)  Champion was the last company

to operate Lee Filter.  (P248 at 3.)

      12.    Champion's early submissions to the NJDEP indicate that a septic tank had been

in use and was taken out of service between 1965 and 1967.  (Tr. 1/7/09 at 83; P138, C03791;

D15, C01343.)  These submissions refer to the tank as an "abandoned septic system."  (D11,

C07772; D29, C03240.)

      13.    The septic tank was the only known method of waste disposal at the Interlee Site

at least until the building was connected to the sewer line.

-4-

NOT FOR PUBLICATION

14.     Sewers were installed in this area of Edison in 1965.  (P89.)  As such, 1965 is the earliest year that the Lee Filter building could have been connected to it.

15.     Lee Filter's manufacture of automotive filters continued at the Interlee Site under various owners for approximately 24 years, until 1985.  (D7, C00820 at ¶ 2; Tr. 1/6/09 at 68-69.)

16.     Lee Filter produced several thousands of spin-on oil filters per day throughout its operations, and always sought to increase production.  (Tr. 1/7/09 at 84-87.)  By the 1980's, Lee Filter was producing at the Interlee Site an average of 28,000 spin-on filters in one shift on one manufacturing line, and it usually had two lines running.  (Tr. 1/7/09 at 85-87.)

17.     Lee Filter admitted using numerous chemical products in its operations, including those containing significant amounts of methylene chloride, TCA, and toluene.  (P99 at C00852, C00894, C00993.)

18.     Champion used either TCE or PCE in the quality control laboratory in the Lee Filter building.  (Tr. 5/4/09 at 59-63; Tr. 1/7/09 at 84.)

19.     PCE chemically degrades over time into TCE in the subsurface environment.  (Tr. 3/16/09 at 33.)

20.     Lee Filter reported to NJDEP as late as the 1980s its generation for disposal of hundreds of gallons of chlorinated solvents, using the classification of "F001" on its waste manifests. (D4; D120.)  A waste manifest is a chain of custody form that tracks hazardous waste from the generator of the waste to its ultimate disposal site.  (Tr. 5/12/09 at 39.)  The F001 classification is limited to those chlorinated solvents specifically used for degreasing.  (Tr. 5/12/09 at 53-55, 57; 40 C.F.R. § 261.31.)

NOT FOR PUBLICATION

21.    In the waste manifests submitted to NJDEP in the early 1980s, Lee Filter also reported that it generated for disposal hundreds of gallons of methylene chloride, also known as dichloromethane. (D120, throughout; D9, C04784.)

22.    Along the northeast side of the Lee Filter building was a drum storage area where fifty five gallon drums of waste were placed regularly to await pickup for disposal.  (P138, C03791.)  Ten to fifteen drums accumulated before removal; the drums were removed once every two months.  (Id.)

## II.    Metex's Environmental Investigation

23.    Metex triggered the requirements of the New Jersey Environmental Cleanup Responsibility Act ("ECRA"), now known as the Industrial Site Recovery Act, N.J. Stat. Ann. §§ 13:1K-6 to -14 ("ISRA"), in 1985, and since then has been conducting an environmental investigation of groundwater contamination at the Metex Site.  (P8, METEX-04391; D99 at 1.)

24.    Sampling of the groundwater in the overburden behind the building at the Metex Site conducted in 1984 revealed elevated amounts of TCE and other volatile organic compounds ("VOCs").  (P9 at 11-12.)

25.    Metex has installed 27 monitoring wells on the Metex Site and has regularly sampled the groundwater from these wells since 1986.  (D99 at 1; D. Dem. 3.)  The monitoring wells include six wells in the unconsolidated zone above the bedrock, twelve in the shallow bedrock zone, six in the intermediate bedrock zone and three in the deep bedrock zone.  (P8 at 5-6; Tr. 1/7/09 at 31-32; P. Dem. 1; D. Dem. 3.)

26.    Sampling of the wells at the Metex Site has revealed the presence of groundwater

**NOT FOR PUBLICATION**

contamination at levels in excess of regulatory standards comprised of certain VOCs, primarily

TCE and dichloroethylene ("DCE"), a compound which results from the chemical breakdown of

TCE in the subsurface environment.  (D61, C05486-5488; D. Dem. 3.)  The highest levels of

contamination were found in wells B-2 and B-3 in the rear of the Metex building, and in wells

B-6, PT-7 and PT-2 along the eastern border of the Metex Site.  (D. Dem. 3, diagrams 1-3, 6, 12,

15.)

27.    Metex admits that contaminants have been detected in the groundwater beneath

the Metex Site and that there is a plume of contaminants.  (Tr. 12/10/08 at 131.)

28.    Metex sought to remediate the soils and groundwater behind the Metex building

in the early 1990s.  Continued sampling of that area reveals either no or very low levels of

contamination.  (D61, C05450; D99 at 2; D179 at 1-5, and Tables 1-3.)  NJDEP has not required

any further action by Metex beyond continued monitoring.  (Tr. 12/10/08 at 137.)

29.    To assess the extent of Metex plume's migration offsite at the instruction of the

New Jersey Department of Environmental Protection ("NJDEP"), in 1995, Metex installed an

offsite cluster of three wells, referred to as the OS Wells, on the One Ethel Road property,

downgradient of the Metex Site and only ten feet from the western border of the Interlee Site.

(D99 at 1; Tr. 1/7/09 at 20; Tr. 12/15/08 at 8, 48; P23.)  The location of the OS Wells was

selected by NJDEP because it is downgradient of the Metex contaminant plume.  (Tr. 12/15/09 at

8.)

30.    Metex sampled the OS Wells in September 1995.  (Tr. 1/7/09 at 20.)  The OS

NOT FOR PUBLICATION

Wells were sampled by Champion in February 2000, June 2000, and June 2003.  (P106 at 02280;

P98 at C01439; P17, Figures 25-29.)  The sampling results revealed concentrations of TCE, DCE

and other VOCs above the NJDEP's Ground Water Quality Standards ("GWQS") for each

contaminant during certain sampling events.  (Id.)  (The GWQS establish the designated uses of

the State's ground waters, classify ground waters based on those uses, and specify the water

quality criteria and other policies and provisions necessary to attain those designated uses.  See

N.J. Admin. Code §§ 7:9C-1.1 to -1.11.  At other times, such as in February 2000 and June 2003,

the VOCs detected in the OS Wells were near or below their respective GWQS.  (D. Dem. 3, 12,

14, 24-26.)

     31.     Metex has incurred $11,121.40 in costs to install and sample the OS Wells.  (Tr.

1/7/09 at 30; D 89.)

     32.     In July 2008, Metex submitted to NJDEP its most recent Remedial Investigation

Workplan, in which Metex proposed significant amounts of on-site investigation.  (D99 at 7-9.)

This Workplan also proposed the installation of a borehole on the One Ethel Road property, at

the precise location requested by NJDEP, i.e., closer to the Metex Site than the OS Wells, to

assess the possibility of the off-site migration of the Metex contaminant plume.  (D99 at 9-12.)

This Remedial Investigation Workplan further sought to convert the offsite borehole into a

monitoring well or multiport sampling system if data collected from the borehole revealed

contaminants at levels greater than the GWQS.  (D99 at 12.)

     33.     By letter dated May 14, 2009, NJDEP approved Metex's Remedial Investigation

Workplan, with certain modifications.  (D124 at 2-3.)

-8-

NOT FOR PUBLICATION

III.    **Champion's Environmental Investigation**

34.    The cessation of Lee Filter's operations in 1985 triggered Champion's environmental investigation of the Interlee Site, as required under ECRA, now ISRA.  (Tr. 1/6/09 at 73; Tr. 1/7/09 at 104; P136.)

35.    Champion retained Princeton Aqua Science as its environmental consultant in connection with its investigation of the Interlee Site in 1984 or 1985.  (Tr. 1/6/09 at 64.) Although the consulting firm's names and ownership have changed over the years - Princeton Aqua Science was acquired by International Technology Corp. ("IT") in about 1986, and IT's assets were purchased by Shaw Environmental in about 2000 - the same company has remained Champion's consultant from the start of its environmental investigation through the present. (Tr. 1/6/09 at 7; P138; D11; Tr. 3/19/09 at 70.)

36.    Mr. Rashak has been an employee of IT/Shaw for almost 22 years and has represented Champion in connection with its ISRA case since 1997.  (Tr. 3/19/09 at 69, 75.)

37.    Paul Angelillo, Champion's witness on damages, has been Shaw's Project Manager on the Champion ISRA case since 1996, and previously worked on a pumping test conducted at the Interlee Site in 1995.  (Tr. 4/29/09 at 36-37.)

38.    When Champion's ISRA investigation began, Jeffrey Melofchik, the first IT Project Manager assigned to the investigation, toured the Interlee Site with Champion Vice President of Operations, Charles Casaleggi, and Mr. Gander.  (Tr. 1/6/09 at 28, 29, 64; Tr. 1/7/09 at 102-03.)  Mr. Casaleggi and Mr. Gander pointed out the septic tank to Mr. Melofchik.  The

NOT FOR PUBLICATION

tank's manhole cover and the concrete slab that surrounded it were the only visible portions of

the tank; the remainder of the tank was underground.  (Tr. 1/6/09 at 65.)

39.     During this initial site visit, the manhole cover of the tank was removed and Mr.

Melofchik observed water in the tank.  (Tr. 1/6/09 at 66.)

40.     IT sampled the sludge in the septic tank in July 1986 as part of its ISRA (then

ECRA) investigation.  (D14; D15.)  The sludge sample contained 190,000 parts per million

("ppm") of oil and grease (which is mathematically equivalent to 190,000,000 ppb).  Oil and

grease comprised 19% by weight of the sludge sample.  (Tr. 1/6/09 at 87; D15, C01344; Tr.

5/8/09 at 134.)  The sludge also contained 130,000 ppm (or 130,000,000 ppb) of petroleum

hydrocarbons, meaning that petroleum hydrocarbons comprised 13% by weight of the sample.

(Tr. 1/6/09 at 87-88; D15, C01344; Tr. 5/8/09 at 134.)

41.     The septic tank sludge sample also contained over 700,000 parts per billion (ppb)

of volatile organic compounds (Tr. 1/6/09 at 88-91; D16; D15 at C01346; D14), including the

following:

    a.     1,100 parts per billion (ppb) of PCE, which chemically degrades over time
           in the subsurface environment into TCE;
    b.     3,300 ppb of TCE;
    c.     11,000 ppb of cis-1,2 dichloroethylene (1,2-DCE), the result from the
           chemical breakdown in the subsurface environment of TCE;
    d.     1,000 ppb of vinyl chloride, the result from the breakdown of 1,2-DCE;
    e.     620,000 ppb of trichloroethane, 1,1,1-TCA ("TCA");
    f.     54,000 ppb of 1,1 dichloroethane, 1,1-DCA ("DCA"), the result from the
           chemical breakdown of TCA in the subsurface environment;
    g.     5,100 ppb of methylene chloride; and
    h.     2,100 ppb of toluene.

(D14; Tr. 5/5/09 at 18.)

-10-

NOT FOR PUBLICATION

42.     The oil, grease, petroleum hydrocarbons and VOCs found in the septic tank

sludge reveal that the tank received industrial wastes.  (Tr. 5/8/09 at 134.)

43.     In furtherance of its environmental investigation, IT attempted to excavate the

septic tank in May 1987.  (Tr. 1/6/09 at 97, 104-05.)

44.     During the attempted excavation, the concrete slab surrounding the tank's

manhole cover was broken, along with cinderblocks comprising a portion of the tank's wall.  (Tr.

1/6/09 at 96-97.)

45.     Because certain portions of the cinderblock walls had broken during the

excavation attempt, the NJDEP instructed Champion to abandon the removal process, and to

decommission the tank in place and back fill the area.  (D20; Tr. 1/6/09 at 53.)  The record is

unclear whether the tank was decommissioned in place or excavated.  (D20; D23, C04049; Tr.

1/6/09 at 98.)

46.     Following the attempted excavation of the tank, Champion did not perform any

sampling of the soils in the immediate vicinity of the tank, nor did it sample the area beneath the

tank.  (Tr. 1/6/09 at 98; Tr. 5/6/09 at 28; D124 at 3.)  Champion began a groundwater

investigation and installed three monitoring wells (MW-1, -2, and -3) near the tank.  (Tr. 1/6/09

at 98.)

47.     Sampling of those wells revealed VOC contamination similar to that contained in

the 1986 septic tank sludge.  (Tr. 1/6/09 at 99; P101, C04050.)  Based on these results, the

NJDEP concluded that the "presence of high levels of contaminants in the facility's septic system

has contributed to the groundwater contamination at this site."  (D24, C04767.)

NOT FOR PUBLICATION

48.     Between 1987 and 1991, Champion installed twenty monitoring wells on the
Interlee Site (MW-1 through MW-20).  (D37, Figure 2, C00028, C00053; P. Dem. 1.)  The wells
are installed into the overburden and the shallow, intermediate and deep zones of bedrock, at
depths ranging from 10 feet to 120 feet below land surface.  (D37, Figure 2, C00050.)

49.     Champion has sampled the wells repeatedly through April 2005.  The sampling
results consistently reveal significant amounts of the same VOCs found in the septic tank sludge
in 1986, including PCE, TCE, DCE, TCA, DCA, methylene chloride, and toluene.  (D. Dem. 3
and 4.)

50.     The concentrations of PCE, TCE, DCE and vinyl chloride - all parent or daughter
products of each other - that were detected in the septic tank sludge in 1986 are several times
greater than the concentrations of the same contaminants found at any time in any of the
monitoring wells installed throughout the Interlee Site.  (D. Dem. 13.)

51.     The contaminant plume at the Interlee Site is located primarily in the intermediate
and deep zones of the bedrock, with relatively less contamination in the shallow zone.  (D. Dem.
3; Tr. 5/4/09 at 148.)  The contaminant plume at the Metex Site is located primarily in the
shallow zone.  (Id.)

52.     Champion acknowledged during the first ten years of its investigation that the
septic tank was the source of the groundwater contamination at the Interlee Site.  In an October
1988 report to NJDEP, IT reported: "The results exhibited by the samples collected from MW-1
through MW-7 indicate that contamination is not from an offsite source and appears to be the
result of leakage from the former septic tank."  (D26, C04499.)

-12-

NOT FOR PUBLICATION

53.     Based on this understanding, in 1990 and 1991 Champion proposed to NJDEP a "pump and treat" system to remedy the contamination.  (Tr. 4/29/09 at 83-85; Tr. 4/30/09 at 40.) NJDEP approved the remedial proposal in April 1991, with modifications.  (D33; D34.)

54.     Over the next four years, Champion undertook various preparatory measures in furtherance of its pump and treat remedial plan, including the installation of the final 6 of the 20 onsite monitoring wells, submission of necessary permit applications, and the design of the water treatment system.  (D34, C04918; Tr. 1/6/09 at 130; Tr. 4/29/09 at 85.)

55.     In May 1995, Champion conducted a 48-hour continuous pumping test on deep bedrock monitoring well 8 (MW-8) to determine whether it could pump enough water to act as the pumping well for the groundwater treatment system.  (Tr. 5/5/09 at 8; P105, C00713, C00722-23; Tr. 4/29/09 at 83-84.)  The well did not pump more than 0.7 gallons per minute on a sustained basis.  (Tr. 5/5/09 at 8-9.)

56.     In late 1995, Champion took the position with NJDEP that the Metex contaminant plume had migrated to the Interlee Site, and that Metex, not Champion, was responsible for the contamination at the Interlee Site.  (Tr. 4/29/09 at 48.)

57.     At around the same time, Champion abandoned its plan to execute a pump and treat groundwater remedy and, instead, sought to convince NJDEP that Metex was the source of the contamination on the Interlee Site.  (P153, C05203-04; Tr. 4/29/09 at 51-63; P234.)

58.     NJDEP suspended Champion's obligation to remediate the Interlee Site in 1995 or 1996 in order to give Champion the opportunity to demonstrate that the Metex contaminant plume is the source of the contamination on the Interlee Site.  (D124 at 2; P150.)

NOT FOR PUBLICATION

59.     Champion has not demonstrated that the Metex contaminant plume has migrated to the Interlee Site.

60.     Subchapter 3.7(g) of New Jersey's Technical Regulations imposes certain requirements upon a party who, like Champion, alleges an off-site source of groundwater contamination.  See N.J. Admin. Code § 7:26E-4.1; N.J. Admin. Code § 7:26E-3.7(g).  (Tr. 4/30/09 at 95-96; Tr. 3/16/09 at 30-32.)

61.     Among other things, Subchapter 3.7(g) requires a party claiming an offsite source of contamination to install and sample an appropriate number of monitoring wells at the party's upgradient property boundary and outside the influence of all onsite areas of concern.  See N.J. Admin. Code § 7:26E-3.7(g).  (Tr. 3/16/09 at 30-32, 56-57; D52.)

62.     Based on the provisions of Subchapter 3.7(g), the NJDEP required Champion to fulfill several requirements in order to prove its migration claim, including the installation of wells upgradient of the Interlee property boundary.  (Tr. 3/16/09 at 30-32.)

63.     In 1997, NJDEP instructed Champion to install two wells upgradient of the Interlee Site, close to Talmadge Road, in an effort to test its claim.  (P238.)  Champion has not installed the wells.  (Tr. 4/29/09 at 55-56.)

64.     In 2001 and 2002, NJDEP required Champion to install four sets of cluster monitoring wells along its upgradient (western) property boundary, each cluster consisting of wells installed into the shallow, intermediate and deep bedrock zones.  (D62; D65.)  NJDEP provided Champion with a diagram indicating where the cluster wells should be placed.  (D65, C05319; Tr. 3/16/09 at 34-37.)  The Department made clear that fulfillment of these

-14-

**NOT FOR PUBLICATION**

requirements was necessary for the agency to evaluate Champion's claim of an offsite source. (D63, C05288.)  Champion has not installed the cluster wells.  (P218; P63, C05287.)

65.     For the past ten years, Champion has sought a "no further action" determination from the NJDEP with respect to the Interlee Site.  (Tr. 4/29/09 at 63-64; P112; D118.)  Such a determination would relieve Champion of any further investigatory or remedial responsibilities. (Tr. 4/29/09 at 59.)

66.     The NJDEP issued a Notice of Violation to Champion in 2002 for its failure to install the four well clusters and to fulfill the NJDEP's other investigatory requirements set forth in its September 20, 2001 letter.  (D65; D62.)

67.     In the nearly seven years that have passed since the NJDEP issued the Notice of Violation, Champion has not installed the cluster wells or performed the other obligations necessary to support its migration claim.  (D124.)

68.     Champion has continued to conduct sampling of the existing monitoring wells located on the Metex and Interlee Sites and the OS wells.  (P17; Tr. 4/29/09 at 59-63.)  This sampling has not been conducted for purposes of site investigation ultimately leading to the selection of a remedy but, rather, to provide support for Champion's argument that Metex is at fault and for its corresponding request for a no further action determination.  (P112, P132.)

69.     The NJDEP has concluded that Champion has not provided sufficient proof to demonstrate that the Metex plume has migrated to the Interlee Site.  The Department stated in its April 15, 2008 Compliance Status Notice to Champion:

> Champion's proposal for no further action and that Metex is the source of the bulk of the contamination at the Interlee site, remains unacceptable, as unsupported.

**NOT FOR PUBLICATION**

> The sampling performed provides no new information in support of Champion's claim as the sampling was from existing wells and the results were similar to previous events.

(P216, C08816.)

70.    In the Notice of Deficiency issued on May 14, 2009 after fourteen years since

Champion first started blaming Metex for the contamination on the Interlee Site, NJDEP

reminded Champion that the Department

> has not to date received any information regarding completion of the required off-site up-gradient groundwater contamination investigation.  The Department has allowed more than ample time for Interlee [Champion] to conduct these activities to determine the off-site chlorinated volatile organic compound contribution, which have not been initiated.  The Department issued a Notice of Violation regarding this issue in 2002.

(D124.)

71.    NJDEP ordered Champion in 2002 and again in its May 2009 Notice of

Deficiency to resume its 1991 Approved Plan to execute a pump and treat remedy at the Interlee

Site.  (D63; D124 at 1, 2.)

72.    The Department stated in its April 15, 2008 Compliance Status Notice: "[I]t is

impossible for the NJDEP to make a determination on responsibility without the information

required by the NJDEP's letter dated September 2001."  (P216, C08817; D62; D63, C05288.)

73.    NJDEP also is "not currently satisfied that Interlee/Talmadge identified or

investigated all sources of groundwater contamination" at the Interlee Site.  (D124 at 2.)

Specifically, the Department is now questioning the adequacy of the investigation Champion

conducted twenty years ago of the septic tank, the drum storage area, the building's piping and

floor drains, and the stream as a possible discharge point for contamination.  (D124 at 3; Tr.

-16-

NOT FOR PUBLICATION

5/5/09 at 4, 39.)  In its May 2009 Notice of Deficiency to Champion, NJDEP states that "the

investigation done at the septic tank does not appear to follow current standards."  (D124 at 3.)

The agency is now requiring Champion to re-evaluate whether all such areas were adequately and

properly investigated and, if necessary, to conduct additional investigations of those areas of

concern "to fill in data gaps."  (D124 at 2-3.)

   74. Champion has not begun any clean up activities at the Interlee Site.  (Tr.

4/29/09 at 48; Tr. 4/30/09 at 90.)

   75. NJDEP has not granted Champion's request for a no further action determination.

(Tr. 4/29/09 at 63-64; D124 at 1.)

   76. Champion resolved the natural resource damage liability on the Interlee Site with

the State of New Jersey for $95,328.38 in a judicially approved settlement with regard to the

discharge of contamination on the Interlee Site.  (P127.)  The settlement does not relieve,

however, Champion's obligations to remediate the contamination.  (P126 at ¶ 8; P127 at ¶ 11.)

**IV. Evidence Regarding the Source of Contamination on the Interlee Site**

   77. At trial, the Court heard testimony of two hydrogeology experts, Edward Rashak

for plaintiff and Daniel Nachman for defendant.  Hydrogeology is the specialization within

geological science that is concerned with the distribution and movement of groundwater in soil

and bedrock.  (Tr. 4/8/09 at 86:25-87:5.)

   78. The bedrock underlying the Metex and Interlee Sites is characterized by thick

layers of massive rock.  (Tr. 5/4/09 at 109-10.)  Although these rock layers contain tiny fractures,

only some of those fractures transmit water, and not to any great degree.  (Tr. 5/4/09 at 150,

NOT FOR PUBLICATION

163-64.)  The bedrock is very tight, relatively impermeable and transmits water slowly.  (Tr.

5/4/09 at 114-15, 163-64.)

79.     The bedrock is overlain by no more than 8 or 10 feet of soils constituting the

overburden zone.  (Tr. 5/4/09 at 103.)

80.     Illustrative of the low transmissivity (ability to transmit water) of the bedrock

beneath these two sites are the results of the 48-hour continuous pumping test conducted on deep

monitoring well MW-8 at the Interlee Site in May 1995.  The most water that Champion was

able to pump out of the well on a sustained basis was 0.7 gallons per minute, even though the

well has an open interval in the rock of 30 to 40 feet.  (Tr. 5/5/09 at 8-9.)  This low pumping rate

demonstrates the absence of any major water bearing fracture and the low permeability of the

rock under the two sites.  (Tr. 5/5/09 at 9.)

81.     The various tests performed by the parties, including borings, pump tests, slug

tests conducted at both Sites and the pumping test conducted at the Interlee Site, reveal that the

bedrock at these Sites transmits little water.  These results indicate that there is no major water-

bearing fracture zones to a depth of 160 feet below land surface, which is significantly below the

deepest monitoring wells installed at both sites.  (Tr. 5/4/09 at 114-15.)

82.     To the extent the Metex contaminant plume is able to migrate, it is able to

do so through the low-permeability, small vertical and horizontal fractures present in the upper

bedrock, not through a more permeable major fracture zone that may lie far below the plumes

located beneath the two sites.  (Tr. 5/4/09 at 114-15.)

83.     A consideration in the analysis of plume migration is the direction in which

NOT FOR PUBLICATION

groundwater flows through the bedrock.  (Tr. 5/4/09 at 114.)

84.     At the sites in issue, groundwater in the bedrock flows generally from west to east, that is, from the Metex Site generally towards the Interlee Site.  (Tr. 5/4/09 at 114.)

85.     Groundwater in the overburden at the Metex Site does not flow to the east but, rather, to the north.  (Tr. 5/4/09 at 153.)

86.     The speed at which groundwater flows through the bedrock, or groundwater velocity, is an important component of the hydrogeological analysis of plume migration.  (Tr. 5/4/09 at 126, 128.)

87.     Groundwater velocity is determined by a mathematical calculation that involves three factors: the gradient (slope) of groundwater flow, multiplied by the hydraulic conductivity of the rock (like transmissivity, its ability to transmit water), the product of which is divided by the effective porosity (percentage of open spaces) of the bedrock through which the groundwater flows.  (Tr. 5/5/09 at 11; D94 at 18-19.)

88.     The use of this formula to determine groundwater velocity in porous media - even tight bedrock such as is present beneath the two sites - is widely accepted in hydrogeology texts. (Tr. 5/4/09 at 135, 136, 149.)  In addition, in a 1998 Final Guidance, the NJDEP required all parties responsible for groundwater contamination to establish a "Classification Exception Area" ("CEA").  (Tr. 5/5/09 at 11-12.)  A CEA is an area of known contamination with a defined geographical area.  (Tr. 5/5/09 at 10.)  The Final Guidance requires the use of this calculation to determine groundwater velocity (also called "seepage velocity").  (D94 at 18-19; D. Dem. 23.) The use of this formula is not restricted to sandy aquifers.  (Tr. 5/4/09 at 149.)

-19-

NOT FOR PUBLICATION

89.     New Jersey's Technical Regulations, Subchapter 4.4, which governs remedial investigations of groundwater, further supports the importance of this formula in determining plume migration.  This Subchapter requires parties conducting a remedial investigation to conduct aquifer tests, which "at a minimum, shall include the site water table gradient, hydraulic conductivity (K), and an estimate of the rate of ground water and contaminant flow in the aquifer."  N.J. Admin. Code § 7:26E-4.4(h)(3)(iii).

90.     The pumping, limited pump and slug tests conducted by the parties at the two Sites provide data to determine average hydraulic conductivities over the three depth intervals of bedrock that were sampled.  (D. Dem. 18 (Table II); Tr. 5/4/09 at 137-38.)  Metex's expert, Daniel Nachman, derived the gradient value of 0.005 directly from the groundwater contour maps prepared by the parties' consultants for the two sites.  (Tr. 5/4/09 at 138.)

91.     Mr. Nachman incorporated into the formula a conservative literature value for effective porosity of 0.1, or 10%.  (Tr. 5/4/09 at 139; 5/8/09 at 137-38.)  Champion criticizes Mr. Nachman's use of this value, and suggests it should have been closer to 0.003, based on an article by Carlton and Buxton et al.  (D95; Tr. 5/8/09 at 29-31.)  The 0.003 effective porosity value posited by Champion is not derived from data specific to the Metex and Interlee Sites, and is not appropriate for use in tight bedrock such as that underlying the Metex and Interlee Sites.  Rather, Carlton and his colleagues employed this value specifically to determine groundwater velocity in a major bedding plane parting, where groundwater flows quickly, a condition not present at these sites.  See supra ¶¶ 80-82.  (Tr. 5/8/09 at 123; D95 at 51, 54.)  If the 0.003 effective porosity value were incorporated into the groundwater velocity equation, the result would be that the

**NOT FOR PUBLICATION**

Metex contaminant plume would have migrated from the Metex Site to the Interlee Site in less

than a single year (by the mid-1970's).  Such a proposition is unsupported by the sampling data

and at odds with Champion's theory that the Metex contaminant plume arrived on the Interlee

Site in the late 1980s.  (Tr. 5/11/09 at 4-5.)

92.     Calculating the groundwater velocity under both sites using the hydraulic

conductivity, gradient and effective porosity figures employed by Mr. Nachman results in an

average groundwater velocity of about 20 feet per year across the three depth intervals of bedrock

in which the parties have installed monitoring wells, ranging from a high velocity of 73 feet/year

in the shallow bedrock zone and a low velocity of 1.6 feet/year in the deep zone.  (Tr. 5/4/09 at

139-40.)

93.     Average groundwater velocity of 20 feet/year means that the bedrock is acting as a

tight filter and, as a result, groundwater is moving slowly through the bedrock.  (Tr. 5/4/09 at

140.)

94.     Mr. Nachman's calculation and his use of an average groundwater velocity here

are credible and accepted by the Court in light of the available data to derive hydraulic

conductivity values from various tests conducted at the two properties.  (Tr. 5/4/09 at 140-41; D.

Dem. 18 (Table II).)  The determination and use of an average groundwater velocity is not

criticized in the hydrogeology literature.  (Tr. 5/4/09 at 141.)

95.     Plaintiff's expert, Mr. Rashak, has failed to offer any calculation of groundwater

velocity of his own.  Nonetheless, he points to the highest velocity that Mr. Nachman calculated

in the shallow bedrock - 73 feet/year (D. Dem. 18, Table II) - and asserts that this velocity

NOT FOR PUBLICATION

demonstrates that the Metex contaminant plume could have traveled through the shallow bedrock zone to the shallow bedrock zone at the Interlee Site. (Tr. 4/28/09 at 43.) The plume diagrams created by Mr. Rashak depict his contention that the Metex contaminant plume traveled from the Metex Site to the Interlee Site in the shallow bedrock zone by 1989. (D. Dem. 4, diagrams 4 and 5.)

96.     That contention is undermined by two facts: First, if the Metex contaminant plume had traveled to the Interlee Site through the shallow bedrock zone, then the sampling data at the Interlee Site would demonstrate that the contamination appeared in the shallow monitoring wells in the highest concentrations of any of the three bedrock zones. (Tr. 5/4/09 at 142-43.) The sampling data demonstrates the opposite: The contamination on the Interlee Site is present primarily in the intermediate and deep bedrock zones; the shallow zone is relatively uncontaminated. (Tr. 5/4/09 at 142-43, 148; D. Dem. 3, Mr. Nachman's plume diagrams.) In addition, the OS-1 well, which is installed in the shallow zone 10 feet upgradient of the Interlee Site, does not show TCE and DCE levels greater than 10 ppb, while the shallow zone wells at the Interlee Site have far higher contaminant concentrations. (Tr. 5/4/09 at 143; D. Dem. 3, diagrams 9, 12, 15, and 24; D. Dem. 25.)

97.     Second, while the data reveal an average groundwater velocity of 73 feet per year in the shallow bedrock at the Metex Site, the velocity in the shallow bedrock at the Interlee Site is much lower: only 2.68 feet per day. (D. Dem. 18, Table II.) Accordingly, any fractures which may be carrying groundwater at the Metex Site are not continuous with the Interlee Site, and diminish before reaching it. (Tr. 5/4/09 at 142.)

NOT FOR PUBLICATION

98.     To the extent Champion argues that the Metex contaminant plume traveled from the Metex Site to the Interlee Site through a major bedding plane parting, it has failed to so demonstrate.  No tests, such as a tracer test, a pumping test, or use of a video camera or other available method cited in the literature, that identifies and locates that parting, or demonstrates its continuity between the two sites have been conducted and offered by Champion.  (Tr. 5/4/09 at 104, 149-51.)

99.     After determining the rate of groundwater flow, the hydrogeologist analyzing plume migration must determine the rate at which the contaminants at issue are moving through the groundwater.  Contaminants present in groundwater travel more slowly than the groundwater itself due to certain processes that retard their migration.  (Tr. 5/4/09 at 155.)

100.     It is widely accepted in the hydrogeologic literature that, in order to calculate the rate that particular contaminants flow through the groundwater, the groundwater velocity must be divided by the retardation factors for those contaminants.  (Tr. 5/4/09 at 156.)  In most cases, the retardation factor is determined using values within an acceptable range for a particular contaminant as set forth in the hydrogeologic literature.  (Id.)  The retardation values account for the particular tendency of each contaminant to adhere to organic matter and soil, and thus travel more slowly.  (Id.)

101.     As with the groundwater velocity equation, the calculation for contaminant velocity is also required by the NJDEP's Final Guidance for CEAs.  (D94 at 18-19; D. Dem. 23.)

102.     In 2001, Metex's environmental consultant, Environmental Waste Management

NOT FOR PUBLICATION

Associates ("EWMA"), concluded that, at the Metex Site, TCE has a retardation factor of 2.4,

and that 1,2-DCE has a retardation factor of 2.3 (D61), meaning that the contaminants move 2.4

and 2.3 times more slowly, respectively, than the groundwater.  (Tr. 5/4/09 at 157; D61,

C05454-55, C05510.)

103.    Using a more conservative retardation factor of 2 for both contaminants (resulting

in a faster rate of contaminant migration since the denominator of the equation is smaller), TCE

and 1,2-DCE migrate no faster than 10 feet per year beneath the Metex and Interlee Sites

(groundwater velocity of 20 feet per year divided by the retardation factor of 2).  (Tr. 5/4/09 at

157-58.)

104.    At this rate, and without yet considering other forces discussed below that further

inhibit contaminant migration, it would take 40 years for TCE and DCE to traverse the

approximately 400 feet from the eastern Metex monitoring wells (which show the highest TCE

and 1,2-DCE concentrations on the Metex Site) to the Interlee Site property boundary, and

approximately 50 years to travel the 500 feet from the same point to the Interlee septic tank.  (Tr.

5/4/09 at 162.)  Assuming that contaminants began to migrate off the eastern boundary of the

Metex Site in 1974 - the first year of MAP's manufacturing operations and the year of the spill

by MAP's TCE supplier - contaminants from Metex could not theoretically reach the Interlee

Site before 2014.  (Tr. 5/4/09 at 162.)

105.    Champion fails to provide any calculation of its own to account for contaminant

retardation, wrongly contending that a retardation analysis is more appropriate in a sandy aquifer,

rather than in rock, because the contaminants would adhere more readily to the sand than to the

-24-

**NOT FOR PUBLICATION**

rock.  (Tr. 4/08/09 at 39.)  To the contrary, the fractures that run through mudstone are filled with weathered clay that comes out of the mudstone.  This clay is sticky, and contaminants are far more likely to adhere to it than to smooth sand grains.  (Tr. 5/4/09 at 160.)

106.    As contaminants migrate in groundwater, their concentrations further diminish through dispersion, dilution and biodegradation.  (Tr. 5/4/09 at 163-64; Tr. 5/5/09 at 16-18, 21-23.)  Dispersion is the spreading out of contaminants in water, similar to the spread of a drop of dye in a tub of water.  (Tr. 5/4/09 at 163.)  Dilution refers to the mixing of contaminated water with clean water.  (Tr. 5/5/09 at 16.)  Biodegradation refers to the process whereby bacteria and other organisms in the bedrock feed on the contaminants and break them down into their degradation, or "daughter," products.  (Tr. 5/5/09 at 16-17.)

107.    At the Interlee Site, there is ample evidence that biodegradation has taken place because the sampling data shows not only TCE, but also significant amounts of its daughter products, cis-1,2 DCE and vinyl chloride.  (Tr. 5/5/09 at 17-18.)  Similarly, the data reveals the presence of 1,1-DCA, a daughter product of 1,1,1-TCA.  (Tr. 5/5/09 at 18.)

108.    A contaminant plume eventually stops growing and migrating when the rate of contaminant dispersion, dilution and biodegradation equals the rate of contaminant migration, producing a state of equilibrium.  (Tr. 5/5/09 at 18.)

109.    Mr. Rashak offered the opinion at trial for the first time that, based on his "estimations," over 99% of the contaminant mass on the Interlee Site originated from the Metex Site, while only 1% originated from the Interlee Site itself.  (Tr. 4/8/09 at 62-63.)  While acknowledging that mass is a mathematical concept, Mr. Rashak could not identify the mass

-25-

NOT FOR PUBLICATION

numerically on either site, nor did he offer any calculation or other process or formula, beyond mere impressionistic observation, to justify his conclusion.  (Tr. 4/8/09 at 81-86.)  This opinion is a "net" opinion, unsupported by any evidence, not believable and rejected by the Court.

110.    To substantiate its claim that Metex is the source of the groundwater contamination at the Interlee Site, NJDEP also required that Champion demonstrate a clear contaminant concentration gradient extending from the Metex Site through the One Ethel Road site and then onto the Interlee Site.  (D62, C05333; P155, C05431; Tr. 3/16/09 at 68-70.)  To demonstrate an offsite source of contamination, a gradient may be said to exist where concentrations of contamination coming onto a party's property are greater than the concentrations already on the property.  (Tr. 5/6/09 at 46.)  Champion has been unable to demonstrate such a gradient.  The only data points between the Metex Site and the Interlee Site are the OS wells.  As the NJDEP has concluded, "data from these wells do not help Interlee's case" and at best are "inconclusive."  (D62, C05333; P186, C00888; P31, C00591.)

111.    The only wells close to the upgradient property boundary of the Interlee Site that are located downgradient of the Metex Site are the OS Wells installed by Metex in 1995.  (Tr. 5/6/09 at 46-51; P. Dem. 1.)

112.    The OS-1 Well, which monitors the shallow bedrock layer, has never contained TCE and its daughter products at concentrations greater than 10 ppb, while several shallow zone wells at the Interlee Site contain far higher concentrations of these same contaminants.  (D. Dem. 25; Tr. 5/6/09 at 46-47, 50.)  This evidence indicates that Metex is not now the source of the contamination in the shallow bedrock beneath the Interlee Site.

-26-

NOT FOR PUBLICATION

113.    Similarly, the detection of the highest concentrations of TCE and its daughter products in the OS-2 Well, which monitors the intermediate bedrock layer, was 183.6 ppb in 1995; by comparison, at least three intermediate bedrock wells installed on the Interlee Site have detected the same contaminants at concentrations in excess of 1,600 ppb.  (D. Dem. 25; Tr. 5/6/09 at 48-49.)  The much lower levels detected in the OS-2 Well reveal a separation between the contaminant plumes in the intermediate zone underlying the two sites, and thus the absence of a contaminant gradient from the Metex Site to the Interlee Site.  (Tr. 5/6/09 at 49.)

114.    The sampling data from the OS-3 Well similarly show the absence of a contaminant gradient in the deep bedrock zone.  TCE and DCE were detected at very low levels in well OS-3 in the deep bedrock zone in both February 2000 and June 2003 - levels much lower than those detected in Interlee's deep monitoring wells during the same time periods.  (Tr. 5/4/09 at 148; D. Dem. 3, Diagrams 14 and 26; P106 at C02280 (OS-3), C02273 (MW-8), C02274 (MW-11), C02275 (MW-19); P17, Figure 29.)

115.    As example, sampling of the OS-3 Well conducted in February 2000 detected 54 ppb of total VOCs.  By contrast, in the same sampling event, deep wells on the Interlee Site revealed concentrations of 315 ppb total VOCs in MW-8 and 293 ppb in MW-11.  (D. Dem. 3, diagram 14; Tr. 5/6/09 at 49.)  Only 1 ppb of TCE and 3.8 ppb of cis 1,2-DCE, its breakdown product, were detected in the OS-3 Well located in the deep bedrock layer, while at least two wells installed into the deep bedrock zone at the Interlee Site showed concentrations two orders of magnitude, i.e., one hundred times, greater.  (D. Dem. 3, diagram 14.)

116.    The June 2003 sampling data in the deep bedrock zone also reveal the absence of

-27-

**NOT FOR PUBLICATION**

a contaminant gradient from the Metex Site to the Interlee Site. OS-3 contained 7 ppb total VOCs, while 48 ppb of total VOCs were detected on the Interlee Site in MW-8, and 55 ppb of total VOCs were detected in MW-19. (D. Dem. 3, diagram 26; Tr. 5/6/09 at 49.) None of the OS Wells showed over 7.1 ppb of contamination in the June 2003 sampling event. (D. Dem. 3, diagrams 24, 25 and 26; Tr. 5/6/09 at 52.) If the Metex contaminant plume were migrating onto the Interlee Site, the contaminant levels in the OS Wells would have been considerably higher (Tr. 5/6/09 at 50.)

117.    Plaintiff has not demonstrated a contaminant gradient between the Interlee Site and the Metex Site. (D. Dem. 11; D. Dem. 3; Tr. 5/4/09 at 143; Tr. 5/6/09 at 42.)

118.    Champion's Mr. Rashak claims that Champion need look only to Metex's wells to demonstrate a contaminant gradient. (Tr. 4/9/09 at 70-71.) The Technical Regulations are clear, however, that the background wells used to determine whether and to what extent contamination is migrating onto a site should be installed at the site's upgradient property boundary - not 400 feet away. See N.J.A.C. 7:26E-3.7(g). The NJDEP geologist assigned to the Metex and Interlee ISRA cases, confirmed in his testimony that Champion's reliance upon the Metex wells as background wells - in the absence of wells at the Interlee Site property boundary - was inappropriate because the Metex wells are located too far away. (Tr. 3/16/09 at 93-94.)

119.    The plume diagrams created by Mr. Rashak are not credible. In depicting the Metex contaminant plume migrating onto the Interlee Site, the diagrams distort the plumes. (Tr. 5/6/09 at 41; P267; D. Dem. 4, diagrams 10, 12, 14, 17.) The Champion diagrams depicting sampling events before the installation of the OS Wells in 1995 show the contaminant plume

NOT FOR PUBLICATION

migrating directly from west to east, straight through the area where the OS Wells were later installed.  (D. Dem. 4, diagrams 2, 4-8.)  The Champion diagrams depicting the plumes after the OS Wells were installed, however, go around and avoid the OS Wells in an attempt to connect the higher concentrations found both to the east and west of the OS Wells while ignoring the low concentrations detected in those wells.  (Tr. 5/6/09 at 42-43; D. Dem. 4, diagrams 10-14, 16-18.)

120.    Mr. Rashak's plume depictions are also inconsistent.  In his diagram 11, which depicts the February 2000 sampling event in the intermediate bedrock, the center of the plume curves to the north of the OS-2 Well.  (D. Dem. 4, diagram 11; Tr. 5/6/09 at 43.)  By contrast, in diagram 12, which depicts the February 2000 sampling event in the deep bedrock, the center of the plume curves to the south of the OS-3 Well.  Champion has offered no hydrogeological mechanism to explain how and why a plume would flow in one direction in one depth zone and in the opposite direction in the adjoining zone.  (Tr. 5/6/09 at 43-44.)

121.    Mr. Rashak's depictions of groundwater flow direction lack credibility.  All of his diagrams relating to sampling events in the shallow bedrock before February 2000 depict a plume moving in an easterly direction.  (D. Dem. 4, diagrams 1-3, 6; Tr. 5/6/09 at 41-42.)  Starting in February 2000, however, the plumes in the shallow zone take a sudden 90 degree turn to the south east, while the plumes in the intermediate and deep zones continue in an easterly direction.  (D. Dem. 4, diagrams 10, 13, 16; Tr. 5/6/09 at 42.)  Again, no scientific principle has been offered to explain this dramatic change in the direction of groundwater flow, particularly in only one of the three zones being monitored.  (Tr. 5/6/09 at 42-43.)

122.    Most incredible is Defendant's Demonstrative Exhibit 12, which is Mr. Rashak's

**NOT FOR PUBLICATION**

diagram of a purported cross section of the Metex plume based on June 2000 data.  Mr. Rashak

shows the groundwater plume as migrating downward from the shallow to the deep zone before

reaching the Interlee Site, avoiding the OS-1 and OS-2 wells in which no VOCs are detected.

Then, the plume turns and migrates back in an upward direction to account for the contamination

present in the shallow and intermediate zones at the Interlee Site.  (D. Dem. 12.)  Mr. Rashak's

depiction of an allegedly single plume that both dives and then climbs defies the basic principle

of hydrogeology:  Because groundwater moves in the direction of hydraulic head, that is, from an

area of high pressure to an area of low pressure, it can migrate either downward or upward in a

particular area, but cannot travel in both directions.  (Tr. 5/6/09 at 52-54.)

      123.    The explanation that Champion offers for the low contaminant concentrations

detected in the OS Wells - and its avoidance of the data from those wells in its plume diagrams -

is the possibility of offsite pumping that would draw contamination away from those wells.  (Tr.

4/9/09 at 60-62.)  However, Champion offers no evidence that such pumping ever took place,

and it performed no investigation to determine any link between a particular pumping event and

the sampling results in the OS Wells.  (Tr. 3/19/09 at 21; Tr. 4/9/09 at 60-62, 71-72.)

      124.    By contrast, the plume diagrams prepared by Mr. Nachman present a more

coherent and plausible depiction of the contaminant plumes at the Metex and Interlee Sites.  The

shapes of the plumes depicted by Mr. Nachman are consistent over time, and more compatible

with the manner in which plumes actually develop, most notably in that they do not twist and

turn without explanation.  (D. Dem. 3.)  Mr. Nachman's plumes more accurately represent the

underlying sampling data from the Metex and Interlee Sites and the OS Wells; unlike Mr.

**NOT FOR PUBLICATION**

Rashak, Mr. Nachman has made conservative assumptions about the presence of contaminants in areas where sampling data is unavailable.   (D. Dem. 3; Tr. 5/4/09 at 143-47.)

125.   Champion has also offered the theory that the chloroform detected on both the Metex Site and the Interlee Site serves as a "tracer" of the migration of the Metex contaminant plume to the Interlee Site.  As is recognized in hydrogeology texts, tracers are not organic compounds that, like chloroform, appear in groundwater.  Rather, a tracer is a dye or salt that a hydrogeologist injects into the groundwater as part of a controlled experiment to quantify groundwater flow rate and direction by monitoring the appearance of the tracer in downgradient wells over a monitored period of time.  (Tr. 5/6/09 at 61-62.)  A contaminant such as chloroform, which appears in the groundwater due to releases that occurred at unknown times and locations, cannot provide hydrogeologists with a precise time measurement with which to gauge plume migration.  (Tr. 5/6/09 at 61-62.)

126.   Neither Champion's consultant nor its expert performed a properly controlled tracer test to track the alleged movement of the Metex contaminant plume.  (Tr. 5/6/09 at 62.)

127.   Chloroform first appeared on the Interlee Site in 1990 in one well, MW-12, located on the eastern portion of the Interlee Site - the side farthest from the Metex Site.  (Tr. 5/6/09 at 57-58; Tr. 4/9/09 at 96-97; P. Dem. 1; D29, 023232.)  This initial detection is the highest concentration of chloroform ever found at the Interlee Site.  (D29, 023232; D49, Table 1, C00731.)  Had the chloroform actually migrated from the Metex Site, it would have first appeared in the wells on the Interlee Site that are closer to the Metex Site, not on the opposite

-31-

NOT FOR PUBLICATION

side of the Interlee Site.  (Tr. 5/6/09 at 57-58.)  Mr. Rashak was unable to attribute this critical

detection of chloroform to Metex.  (Tr. 4/9/09 at 97.)

128.    Chloroform has been detected in the overburden wells at the Interlee Site.

Because the overburden at the Interlee Site is not physically connected to the overburden at the

Metex Site, Metex cannot be the source of the chloroform found in the Interlee wells.  (Tr. 5/6/09

at 58-59.)

129.    Chloroform has not been detected in any of the four sampling events conducted

on the OS Wells located directly downgradient of the Metex plume, suggesting that the

chloroform on the Interlee Site did not originate at the Metex Site.  (Tr. 5/6/09 at 61.)

130.    While Champion asserts that the Metex contaminant plume has continued to

migrate onto the Interlee Site for twenty years, and that chlorinated solvents continue to be

present in Interlee's monitoring wells, the sampling data do not reveal an ongoing presence of

chloroform on the Interlee Site.  Rather, chloroform suddenly appeared in one well on the

Interlee Site in 1990 and 1991, then appeared in all 22 wells on the Site in 1993, then

disappeared from the Site after 1994.  (Tr. 5/6/09 at 57-58; D29, 023232; P105, C00731-00738.)

Chloroform has not been found on the Interlee Site in 15 years, while TCE and its breakdown

products have been detected consistently through the most recent sampling events.  (Tr. 5/6/09 at

57-58; D. Dem. 3.)  This abrupt appearance and disappearance of chloroform is inconsistent with

a plume that is allegedly steadily migrating from the Metex Site to the Interlee Site.  (Tr. 5/6/09

at 58.)

131.    That Lee Filter used the septic tank to dispose of industrial wastes for some period

NOT FOR PUBLICATION

of time is evidenced by the contents of the septic tank sludge sampled in July 1986.  (D14.)  The

sludge sample was composed 19% by weight of oil and grease and 13% by weight of petroleum

hydrocarbons, clearly indicating that the tank received industrial wastes.  (Tr. 1/6/09 at 87-88;

D15, C01344; Tr. 5/8/09 at 133-35.)  PCE, TCE, DCE and vinyl chloride - the same

contaminants that Champion claims migrated from the Metex Site - were detected in the tank

sludge in significant concentrations far in excess of any concentration subsequently detected in

any Interlee monitoring well.  (D14, D. Dem. 13.)  The tank also contained significant

concentrations of TCA, DCA, methelyne chloride and toluene - contaminants that Champion

does not claim migrated from Metex - again, far in excess of the concentrations later detected in

Interlee monitoring wells.  (D14; D. Dem. 3.)

     132.    The use of the tank for the disposal of contaminants is also evidenced by an

October 1994 letter from Champion's then Senior Vice President, Robert Gander, which reported

to NJDEP that in the 1970s, a Lee Filter employee had dumped paint solvents in the septic tank.

(P145.)

     133.    With the exception of chloroform, every contaminant in Champion's

monitoring wells was either used by Lee Filter during its operations or is a degradation product

of a contaminant that Lee Filter used.

     134.    Either PCE or TCE was used and stored in the Lee Filter quality control

laboratory from at least 1969 through cessation of Lee Filter's operations in 1985.  (Tr. 1/7/09 at

93-95; Tr. 5/8/09 at 98.)

     135.    3,300 ppb of TCE and 11,000 ppb of its daughter product, DCE, were present in

**NOT FOR PUBLICATION**

the 1986 septic tank sludge sample.  (D14.)  The high ratio of the daughter product to parent

product demonstrates that the TCE was used at the Interlee Site, likely in the 1960s, allowing

TCE sufficient time to degrade.  (Tr. 5/6/09 at 7-8, 20-22.)  In contrast,  TCA was detected at

620,000 ppb, in far greater concentrations than its daughter product, DCA, which was detected at

54,000 ppb in the tank sludge, indicating that TCA was used at the Site more recently than the

TCE because less degradation has taken place.  (Tr. 5/6/09 at 7-8, 20-22.)

136.    Mr. Rashak acknowledges that the TCE in Interlee monitoring wells

MW-1, -2 and -3 in the 1987 sampling event comes from the septic tank.  (Tr. 3/23/09 at 94; D.

Dem. 3, diagram 2.)

137.    PCE or "perchlor" was used in the quality control lab and stored there in five

gallon buckets for at least sixteen years.  (Tr. 1/7/09 at 93-95.)  PCE was also detected in the

septic tank sludge at 1,100 ppb, and in several wells located on the eastern portion of the Interlee

Site at levels above its GWQS of 1 ppb.  (D14; Tr. 5/6/09 at 29-30; D. Dem. 3, diagrams 6, 7, 10

and 11.)

138.    PCE was detected once at the Metex Site above GWQS, in the overburden, at 45

ppb in 1986.  (D62, C05334.)  It has not been detected above the GWQS in any bedrock zone

well at the Metex Site.  (Tr. 5/6/09 at 30.)

139.    The NJDEP has repeatedly concluded that PCE is not a part of the Metex

contaminant plume; it has determined that the PCE on the Interlee Site may have an onsite source

other than the septic tank.  (D52, C05149; D62, C05334; P216, C08817; Tr. 3/16/09 at 20.)

140.    Substantial concentrations of TCA and DCA, 620,000 ppb and 54,000 ppb,

**NOT FOR PUBLICATION**

respectively, were in the septic tank sludge in 1986.  (D14.)

141.    TCA comprised ten percent of a product used by Lee Filter in its operations.

(P99, C00894.)

142.    In two reports submitted to the NJDEP, Champion has acknowledged

responsibility for the TCA and DCA found on the Interlee Site.  (P5, C03629; P98, C01424;

D62, C05332.)

143.    TCA and DCA, which Champion acknowledges is part of the Interlee plume, and

methylene chloride, which Champion does not attribute to Metex, have been detected in MW-21,

which is north of the OS Wells, and therefore have migrated there from the Interlee Site.  (D.

Dem. 3, diagrams 8 and 11; P. Dem. 1.)

144.    The evidence demonstrates that Metex is not the source of TCA/DCA

contamination at the Interlee Site.

145.    In its waste manifests, Lee Filter reports disposing of hundreds of gallons of

methylene chloride, also called dichloromethane.  (D4 at 2; D9, C04784; D120, C01360, -61,

-64, -66, -69, -71, -74, -75.)  5,100 ppb of this contaminant was detected in the septic tank sludge

in 1986.  (D14.)  Mr. Rashak could not opine to a reasonable degree of scientific certainty that

Metex was the source of the methylene chloride on the Interlee Site.  (Tr. 4/28/09 at 4.)

146.    Champion has not demonstrated by a preponderance of the evidence that the

toluene at the Interlee Site is from Metex.  2,100 ppb of toluene was detected in the septic tank

sludge (D14), and toluene comprised 30% by volume of a lacquer product used by Lee Filter in

its operations.  (P99, C00993.)  As with methylene chloride, Mr. Rashak was not able to opine to

NOT FOR PUBLICATION

a reasonable degree of scientific certainty that Metex was the source of the toluene on the Interlee

Site.  (Tr. 4/28/90 at 3.)

### CONCLUSIONS OF LAW

I.    **CERCLA claims**

   A.    *Section 107(a) Liability: Cost Recovery and Contribution*

Congress enacted the Comprehensive Environmental Response, Compensation, and

Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, to clean up hazardous waste sites and to

impose the costs of such cleanup on parties responsible for the contamination.  See Meghrig v.

KFC Western, Inc., 516 U.S. 479, 483, 116 S. Ct. 1251 (1996) (citing General Elec. Co. v. Litton

Indus. Automation Sys., Inc., 920 F.2d 1415, 1422 (8th Cir. 1990)).  CERCLA provides two

types of legal actions by which parties can recoup some or all of their costs associated with

hazardous waste cleanup: cost recovery actions under Section 107(a), 42 U.S.C. § 9607(a), and

contribution actions under Section 113(f), 42 U.S.C. § 9613(f).  See United States v. Atlantic

Research Corp., 551 U.S. 128, 131-32, 127 S. Ct. 2331 (2007).  Under the statutory scheme, the

clean up of hazardous wastes must precede the suit to recover costs incurred in the clean up.  See

Young v. United States, 394 F.3d 858, 860 (10th Cir. 2005) (citing Gussack Realty Corp. v.

Xerox Corp., 224 F.3d 85, 91 (2d Cir. 2000)).

To impose Section 107(a) liability under CERCLA, Champion must prove the following

four elements: (1) that Metex is one of four categories of potentially responsible parties; (b) that

there was a release or a threatened release of the hazardous substances from the facility into the

environment; (c) that the release or threatened release caused plaintiff to incur response costs;

**NOT FOR PUBLICATION**

and (d) that Champion's costs were "necessary costs of response ... consistent with the national contingency plan."  See CERCLA 107(a), 42 U.S.C.  9607(a); N.J. Tpk. Auth. v. PPG Indus., Inc., 197 F.3d 96, 103-04 (3d Cir. 1999).

Metex does not dispute that the first two elements have been established.  Metex contends, however, that Champion has failed to demonstrate that the costs it has expended are necessary costs of response consistent with the national contingency plan.  The Court agrees.

The only causation required under CERCLA is that the defendant's releases or threatened releases cause the plaintiff to incur response costs.  See Dedham Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d 1146, 1153 (1st Cir. 1989) (citing Artesian Water Co. v. Government of New Castle County, 659 F. Supp. 1269, 1281-82 (D. Del. 1987), aff'd, 851 F.2d 643 (3d Cir. 1988)).  It is not required that the defendant cause actual contamination of the plaintiff's property.  See Dedham Water Co., 889 F.2d at 1154.  Therefore, for purposes of CERCLA, Champion need only prove that the release of contaminants on the Metex Site caused it to incur response costs.  See id. at 1153-54; see also Artesian Water, 659 F. Supp. at 1281-82, aff'd 851 F.2d 643 (3d Cir. 1988) (neighbors of a site on which hazardous wastes have been deposited may recover response costs incurred as the result of the threat that such wastes could migrate into their wells, even though the wells were not yet contaminated).   Whether a release has caused the incurrence of response costs "should rest upon a factual inquiry into the circumstances of a case and whether the particular hazard justified any response action."  United States v. Alcan Aluminum Corp., 964 F.2d 252, 266 (3d Cir. 1992).

NOT FOR PUBLICATION

Here, Champion began its activities with regard to the groundwater contamination in response to the state law mandate of ECRA, now known as ISRA.  See supra Finding of Fact ¶ 34.  Until 1995, the costs it expended related to preliminary investigation of the site as directed by the NJDEP based on Champion's belief that the contamination had an onsite origin.  See Findings of Fact ¶¶ 52-55.  From 1995 on, Champion has conducted its investigation to convince the NJDEP to accept its changed position that Metex is responsible for the contamination and that Champion should be relieved of the liability to remediate its own site.  See Findings of Fact ¶¶ 56-57, 68.  Champion has been unsuccessful in this regard, in part, because it has not performed the measures to confirm its theory of an offsite source.  See Findings of Fact ¶¶ 63-64, 67.  The Court finds that Champion has not acted in response to the perceived threat from the Metex Site.  Rather, Champion has been motivated by a desire to avoid liability of the clean up and to shift blame to Metex.  Champion has therefore failed to show causation.  More fundamentally, because Champion has not incurred any response costs, see infra, it cannot be said that the environmental hazard at the Metex Site caused Champion to incur response costs.

CERCLA defines "response" as "remove, removal, remedy, and remedial action" and "remedy" or "remedial action" to mean a permanent remedy undertaken to prevent or minimize the release of hazardous substances.  See CERCLA § 101(24)-(25), 42 U.S.C. § 9601(24)-(25). The Third Circuit has held that cleaning up contamination is central to the definition of "response costs":

> The heart of these definitions of removal and remedy are directed at containing and cleaning up hazardous releases.... [T]herefore[,] ... necessary costs of response must be necessary to the containment and cleanup of hazardous releases.

NOT FOR PUBLICATION

Redland Soccer Club, Inc. v. Department of the Army, 55 F.3d 827, 850 (3d Cir. 1995) (quoting

United States v. Hardage, 982 F.2d 1436, 1448 (10th Cir. 1992)) (internal quotation marks

omitted).  To prevail, Champion must show that its costs were "monies ... expended to clean up

sites or to prevent further releases of hazardous chemicals."  Black Horse Lane Assoc., L.P. v.

Dow Chem Corp., 228 F.3d 275, 294 (3d Cir. 2000) (quoting Redland Soccer Club, 55 F.3d at

850) (further citations omitted).  See also Young, 394 F.3d at 860 (response cost is only

"necessary" if it is "closely tied to the actual clean up of hazardous releases."); Amoco Oil Co. v.

Borden, Inc., 889 F.2d 664, 669-70 (5th Cir. 1989) (explaining that "[t]o justifiably incur

response costs, one necessarily must have acted to contain a release threatening the public health

or the environment.").

     In Young, the plaintiffs purchased a property next to a Superfund site.  See 394 F.3d at

860.  They then discovered hazardous substances on the property and undertook preliminary

investigations to assess its nature and extent.  See id. at 861.  Plaintiffs incurred over $237,000

conducting a survey of the property, hiring an environmental consultant to perform an

abbreviated site investigation, and hiring a hydrology and engineering firm to assess the risk to

the employees working on the property.  See id.  Rather than taking action to contain or clean up

the substances, plaintiffs sued the federal government and the city under CERCLA.  See id.  The

court held that because the plaintiffs had not undertaken any cleanup, none of its incurred costs

were recoverable under CERCLA Section 107:

> Plaintiff's alleged response costs were not "necessary" to the containment or
> cleanup of hazardous releases because the costs were not tied in *any* manner to the
> actual cleanup of hazardous releases.  Absolutely no nexus exists between the
> costs Plaintiffs expended and an actual effort to cleanup the environmental

-39-

**NOT FOR PUBLICATION**

> contamination.  To the contrary, Plaintiffs maintain their property continues to be contaminated.  Plaintiffs also repeatedly testified that they do not intend to spend any money to cleanup the contamination on their property.  Plaintiff's cost-recovery claim therefore fails as a matter of law because their alleged response costs were not necessary to either the containment or cleanup of hazardous releases.

Id. at 864.

Likewise, Champion cannot recover its past costs under Section 107 because none of those expenditures has furthered a clean up of the Interlee Site, or sought to contain or assuage the contamination allegedly migrating onto the Site.  See Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 461 (1st Cir. 1992) (retaining consultants to search for the sources of contamination, "not to assuage a threat of future harm[]" but to recover damages from the polluters, is not compensable as a response cost under CERCLA § 107). Champion has not even begun to clean up the contamination on the Interlee Site.  See supra Finding of Fact ¶ 74. Instead, Champion has, for the past ten years, sought a "no further action" determination from the NJDEP with respect to the Interlee Site which would relieve Champion of any further investigatory or remedial responsibilities.  See Finding of Fact ¶ 65.  The costs sought here were expended to persuade the NJDEP that Metex is the source of the contamination on the Interlee Site and to obtain a "no further action" determination.  Champion's own environmental consultant, Paul Angelillo testified at trial:

> Q:    Is it fair to say, Mr. Angelillo, that since 1996, Champion - the efforts that IT has undergone on behalf of Champion has been to try to persuade DEP that i[t] is Metex that is the cause of the contamination at the Interlee Site?
>
> A:    Yes.

NOT FOR PUBLICATION

> Q:       It has not been to remedy the property or to undertake any actions to cleanup?
>
> A:       No.

(Tr. 4/29/09 at 48:8-15.)  Champion's activities from 1996 to the present do not reflect any effort to contain or clean up the Interlee Site.  As in <u>Young</u>, the "costs" expended are not recoverable because they were not "necessary" to contain or clean up contaminants.

The Court also rejects Champion's argument that the costs relate to work performed to identify another responsible party under <u>Key Tronic v. United States</u>, 511 U.S. 809, 820, 114 S. Ct. 1960 (1994).  There, the United States Supreme Court recognized that costs incurred in "[t]racking down other responsible solvent polluters" may be recoverable costs of response if they ultimately benefit a clean up effort and serve a statutory purpose apart from the allocation of costs among responsible parties.  <u>Id.</u>  Champion did not incur any of the claimed costs "tracking down" Metex because it had identified Metex as the alleged cause of the contamination on the Interlee Site in 1995 before it incurred the costs it now seeks to recover.  <u>See supra</u> Findings of Fact ¶¶ 56-57.  As testified to by Champion's consultant, the costs were incurred to minimize the extent of Champion's liability and to shift the blame to Metex in the ISRA case before NJDEP. Simply put, the costs were expended to reallocate costs to another responsible party, the type of services that the Supreme Court held "do[es] not constitute 'necessary costs of response' and [is] not recoverable under CERCLA."  <u>Key Tronic</u>, 511 U.S. at 820-21.  It follows then that judgment must be entered in favor of Metex on the CERCLA Section 107 claim.

The Court also denies Champion's request for a declaratory judgment apportioning response costs.  Declaratory relief is appropriate when

NOT FOR PUBLICATION

> the facts alleged, under all the circumstances, show that there is a substantial
> controversy, between parties having adverse legal interests, of sufficient
> immediacy and reality to warrant the issuance of declaratory judgment. A case is
> ripe where the essential facts establishing the right to declaratory relief have
> already occurred.

Wickland Oil Terminals v. Asarco, Inc., 792 F.2d 887, 893 (9th Cir. 1986) (quoting Maryland

Cas. Co. v. Pacific Coal & Oil, Co., 312 U.S. 270, 273, 61 S. Ct. 510 (1941)) (other internal

citations omitted). Plaintiff has not established by a preponderance of the believable evidence

Metex's relative responsibility for the contamination on the Interlee Site. See supra Findings of

Fact ¶¶ 59, 76-146. Specifically, plaintiff has failed to establish that the VOCs present on its site

originate from an offsite source, let alone from Metex. Consequently, no declaration

apportioning future clean up costs may be entered.

    B.    *Contribution Under CERCLA Section 113(f)*

    Champion seeks contribution from Metex for the damages it paid to the State of New

Jersey as part of a judicially approved settlement under CERCLA Section § 113(f)(3)(B).

Section § 113(f)(3)(B) provides:

> A person who has resolved its liability to the United States or a State for some or
> all of a response action or for some or all of the costs of such action in an
> administrative or judicially approved settlement may seek contribution from any
> person who is not party to a settlement referred to in paragraph (2).

42 U.S.C. § 9613(f)(3)(B); see also Atlantic Research Corp., 551 U.S. 128, 139 n.5, 127 S. Ct.

2331; Cooper Indus. v. Aviall Servs., 543 U.S. 157, 163, 125 S. Ct. 577 (2004). Apart from the

threshold requirement that the plaintiff must have resolved its liability to the United States or a

State in a judicially approved settlement, the elements of the prima facie case for contribution are

the same as those for a cost recovery action under Section 107(a). See N.J. Tpk. Auth., 197 F.3d

**NOT FOR PUBLICATION**

at 104.  Plaintiff must show: (a) that the defendant is one of four categories of potentially responsible parties; (b) that there was a release or a threatened release of the hazardous substances from the facility into the environment; (c) that the release or threatened release caused plaintiff to incur response costs, and (d) that the plaintiff's costs were "necessary costs of response ... consistent with the national contingency plan."  See supra Part I.A.

Champion has resolved the natural resource damage liability on the Interlee Site with the State of New Jersey for $95,328.38 in a judicially approved settlement.  See supra Finding of Fact ¶ 76.  Metex is not party to the settlement.  (P127.)  This Court has earlier ruled that the settlement resolved CERCLA liability.  See Champion Labs. v. Metex Corp., No. 02-5284, 2008 WL 1808309 at *7 (D.N.J. Aug. 21, 2008).

Metex does not appear to dispute that a prima facie showing has been made for the contribution claim because the only argument it offers in defense of the claim is that Champion settled liability arising only from discharges occurring at its own site.  In other words, the settlement only resolved Champion's liability as to the contamination it caused by releasing contaminants on its own site.  The Court agrees with Metex.

The Consent Judgment, reflecting the terms of the settlement between the State of New Jersey and Champion, recites that the State had instituted the action against Champion, among others, under the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J. Stat. Ann. §§ 58:10-23.11 to -23.24, to seek compensation for the damages inflicted on natural resources as a result of the "alleged discharge of hazardous substances at the American Bindery Site."[1]  (P127

---

[1]  American Bindery Site referenced in the Consent Judgment is the Interlee Site.

NOT FOR PUBLICATION

¶¶ E-F.)  The Consent Judgment defined "discharge" in accordance with its definition in the Spill

Act:

> any intentional or unintentional action or omission resulting in the releasing,
> spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous
> substances into the waters or onto the lands of the State, or into waters outside the
> jurisdiction of the State when damage may result to the lands, waters or natural
> resources within the jurisdiction of the State.

N.J. Stat. Ann. § 58:10-23.11(b).  Unlike CERCLA, which imposes strict liability on broad

categories of potentially responsible parties when there is a release or a threatened release from a

facility to the environment, the Spill Act imposes liability to only those who have discharged

hazardous substances.  See N.J. Stat. Ann. § 58:10-23.11g.  Read plainly, the Consent Judgment,

which makes repeated references to "alleged discharges at the American Bindery Site," addresses

liability as to discharges, as defined by the Spill Act, on the Interlee Site by the settling

defendants only and does not encompass any alleged contribution from offsite sources.  Because

the settlement for which Champion seeks contribution encompasses only its own liability, it is

not entitled to contribution from Metex.  Judgment is entered in favor of Metex on the Section

113(f)(3)(B) claim.

## II.   State Law Claims

Champion has also asserted various state law claims against Metex including negligence,

strict liability (abnormally dangerous activity), nuisance,[2] trespass, contribution and

---

[2]  Champion's nuisance claim is dismissed because it is duplicative of its negligence and strict liability claims.  See Kenney v. Scientific, Inc., 204 N.J. Super. 228, 256 (Law Div. 1985) (granting summary judgment on nuisance claim on the same basis); Allied Corp. v. Frola, 730 F. Supp. 626, 633-34 (D.N.J. 1990) (dismissing nuisance claim as duplicative of strict liability claim).

NOT FOR PUBLICATION

indemnification.  For these claims, many of which are duplicative, traditional elements of cause in fact and proximate causation apply and Champion must prove that contaminants on the Metex Site migrated onto its site.  See Weinberg v. Dinger, 106 N.J. 469, 484, 524 A.2d 366 (1987) (to prevail on negligence claim, plaintiff must show that defendant's breach of duty was both the factual and the legal cause of plaintiff's injuries); State v. Ventron Corp., 94 N.J. 473, 488, 468 A.2d 150 (1983) ("a landowner is strictly liable to others for harm caused by toxic wastes that are stored on his property and flow onto the property of others"); New Jersey Tpk. Auth. v. PPG Indus., 16 F. Supp. 2d 460, 478 (D.N.J. 1998) (to prevail, plaintiff must prove "unauthorized entry ... onto the property of another"); T&E Indus. Inc. v. Safety Light Corp., 123 N.J. 371, 398, 587 A.2d 1249 (1991) (a person is entitled to indemnity from another if he, "in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by another."); N.J. Stat. Ann. § 2A:53A-3 (right to contribution arises when an injury or damages is suffered as a result of the wrongful act, neglect or default of joint tortfeasors and one of the joint tortfeasors pays more than his pro rata share of the damage.). This, Champion, has not done.  The Court has concluded that Champion has failed to prove by preponderance of the believable evidence that the contamination on the Interlee Site is the result of migration from the Metex Site.  See supra Findings of Fact ¶¶ 76-146.  Consequently, Champion's state law claims fail.

## III.    Metex's Counterclaim under Section 107 and State Laws

Metex's Counterclaim against Champion asserts claims under Section 107 of CERLA and various state laws for the costs it expended to install and sample wells on the One Ethel

**NOT FOR PUBLICATION**

Road site, the wedge property between the Metex and Interlee Sites.  Metex contends that

contaminant migration from the Interlee Site is responsible for the pollution on the One Ethel

Road property.

For the CERCLA claim, Metex has the same burden of proof as Champion:  It must show

a) that Champion is one of four categories of potentially responsible parties; (b) that there was a

release or a threatened release of the hazardous substances from the facility into the environment;

(c) that the release or threatened release caused Metex to incur response costs, and (d) that the

Metex's costs were "necessary costs of response ... consistent with the national contingency

plan."  See 42 U.S.C. § 9607(a); N.J. Tpk. Auth., 197 F.3d at 103-04.  Metex has failed to meet

the burden of proof.  Metex's four-paragraph discussion of its counterclaims does not even

address the elements for imposing liability on Champion.  Moreover, Metex did not submit any

evidence that it sought to clean up the contamination on the One Ethel Road Site.  For the same

reasons that Champion's Section 107 claim is rejected, so it is with Metex's.

As to the state law claims, Metex has not demonstrated by a preponderance of the

believable evidence that the contamination in the OS Wells is from the Interlee Site.  Because

Metex has failed to carry its burden of proof, declaratory judgment apportioning future costs is

also inappropriate.  Judgment is entered in favor of Champion on Metex's Counterclaim.

**IV.     Champions' Claims Against One Ethel Road Site**

Finally, Champion seeks a declaratory judgment that it is not responsible for any

contamination that may be present on the One Ethel Road site by way of default judgment.  Ivy

Equities, a/k/a One Ethel Road Associates LLC, the owner of the One Ethel Road site and a party

NOT FOR PUBLICATION

in this case, has abandoned its defense of that claim and made no appearances nor communicated to the Court during the course of the trial.  The Court earlier denied Champion's motion for default judgment.  (Dkt. Entry No. 175.)  The Court did so to avoid logically inconsistent adjudication as to liability because the Court could have found at trial that Champion is responsible for contamination of the One Ethel Road site whereas the default judgment against One Ethel Road Associates would declare that Champion is not responsible for such contamination.

Having heard and considered all of the evidence, the Court finds that neither party has established by a preponderance of the credible evidence that it is not responsible for the contamination on the OS Wells on the One Ethel Road property.  As such, a declaratory judgment precluding Champion's liability with respect to the OS Wells is not appropriate.  As to the rest of the One Ethel Road site, Champion has not produced any evidence to support its claim.  Although styled as a declaratory judgment against a defaulting party, the judgment declaring Champion's immunity would prejudice the rights of others such as the State of New Jersey who may have claims with respect to the contamination on the One Ethel Road site.  It follows then that declaratory judgment is denied.  However, to the extent that Ivy Equities, a/k/a One Ethel Road Associates LLC seeks to reopen any claims related to the pollution on its site against Champion at a later date, such claims are precluded because it abandoned its party status without judicial approval.

**NOT FOR PUBLICATION**

**CONCLUSION**

Judgment is entered in favor of defendant Metex on Champion's Complaint.  Judgment is entered in favor of counter-defendant Champion on Metex's Counterclaim.  Default judgment against Ivy Equities, a/k/a One Ethel Road Associates LLC is denied.


August 12, 2009                                                      **s/William H. Walls**
                                                                     United States Senior District Judge